## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SERIES 15-09-321, a designated series of MSP Recovery Series, LLC, Delaware entity, | |
| **Plaintiff,** | Case No. |
| v. | |
| THE HARTFORD FINANCIAL SERVICES GROUP, INC., HARTFORD ACCIDENT AND INDEMNITY COMPANY, HARTFORD FIRE INSURANCE COMPANY, HARTFORD INSURANCE COMPANY OF THE MIDWEST, HARTFORD INSURANCE COMPANY OF THE SOUTHEAST, HARTFORD UNDERWRITERS INSURANCE COMPANY, and TWIN CITY FIRE INSURANCE COMPANY | DEMAND FOR JURY TRIAL PLEADING FILED: _____ |
| **Defendants.** | |

_____/

## COMPLAINT

Plaintiff, Series 15-09-321 brings this action against The Hartford Financial Services Group, Inc., Hartford Accident and Indemnity Company, Hartford Fire Insurance Company, Hartford Insurance Company of the Midwest, Hartford Insurance Company of the Southeast, Hartford Underwriters Insurance Company, and Twin City Fire Insurance Company (singularly "Defendant" and collectively, "Defendants"), and alleges:

## INTRODUCTION

1.      The Medicare program spent $756 billion (roughly 12% of the entire federal budget) in fiscal year 2022 to provide health insurance for roughly 65 million people (around 20% of the U.S. population) who are aged 65 and older or have disabilities. With the aging population expected to become nearly a quarter of the U.S. population by 2060 (95 million people), one of

Medicare's main trust funds is expected to run dry by 2028.[1] For these reasons, identifying and correcting fraud, waste, and abuse—and ensuring the Medicare pays only for bills Congress intended to pay—is more important now than ever before to ensure the long-term sustainability of an essential federal program that has been in existence since 1965.

2.     More than 40 years ago, in 1980, Congress first addressed fears regarding Medicare insolvency by passing with overwhelming bipartisan support the Medicare Secondary Payer Act (the "MSP Act"). The intent of the MSP Act was to staunch the tide of ballooning medical entitlement costs. Prior to the MSP Act, Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained. With the MSP Act, Congress mandated that auto insurers like Defendants—rather than Medicare—would become primarily responsible for medical expenses covered by their insurance policies.

3.     Instead of allowing insurers to accept premiums from their policyholders and then sit back while Medicare paid medical bills covered by the insurers' policies, Congress mandated that the insurers would be primary payers and Medicare would simply provide a safety net for its beneficiaries in the event the insurance carriers did not promptly pay. In short, Congress intended through the MSP Act to transfer the cost and financial burden of healthcare to private insurance plans who were receiving premiums expressly intended to cover the medical expenses being paid by Medicare prior to the MSP Act. Congress enacted section 1395y(b)(1) to reduce federal expenditures by making private automobile insurers primarily liable for the cost of servicing their policies.

---

[1] https://www.whitehouse.gov/briefing-room/statements-releases/2023/03/07/fact-sheet-the-presidents-budget-extending-medicare-solvency-by-25-years-or-more-strengthening-medicare-and-lowering-health-care-costs/ (last visited October 1, 2023) ("[T]he most recent Medicare Trustees Report projected that the HI Trust Fund would be insolvent in 2028 . . . ."). The HI Trust Fund provides funding for Medicare Part A services, such as hospital stays.

4.      Subsequently, when Congress created the Medicare Advantage option under Part C of Medicare, 42 U.S.C. § 1395w-21(a)(1)(B), it ensured that Medicare Advantage Organizations ("MAOs"), just like Medicare, would be deemed the *secondary payer* when the Medicare beneficiaries' medical expenses are covered concurrently by other insurance policies. 42 U.S.C. § 1395w-22(a)(4). Medicare Part C permits Medicare beneficiaries to choose to receive their health care benefits from private insurers through MAOs. As of June 2023, over 31 million individuals— nearly 40% of all Medicare beneficiaries—had elected to enroll with an MAO and participate in a Medicare Advantage Plan ("MA Plan").[2]

5.      To protect Medicare beneficiaries, Congress authorizes both Medicare and MAOs to go ahead and pay a beneficiary's medical expenses first when a primary player has not made or cannot reasonably be expected to make payment promptly. 42 U.S.C. § 1395y(b)(2)(B)(i). Such payments are "intended to minimize patient anxiety about the source of payment and to avoid delays in reimbursement for" medical expenses. H.R. Rep. No. 97-208, pt. 2, at 956 (1981) However, under the MSP Act, Medicare's and the the MAO's payment is conditioned on the primary payer—the insurer—ultimately reimbursing Medicare and the MAO. 42 U.S.C. § 1395y(b)(2)(B)(ii). In this way, Medicare beneficiaries receive the health care they need, but Medicare remains entitled to reimbursement.

6.      When Medicare or an MAO makes a payment that a primary plan was responsible for, the payment is conditional. This rule applies any time an insurer contests liability at the time of the Medicare or MAO payment, or even where Medicare or the MAO paid for a medical expense

---

[2] Monthly Contract and Enrollment Summary Report, Ctrs. For Medicare & Medicaid Servs., https://www.cms.gov/ResearchStatistics-Data-and-Systems/Statistics-Trends-and-Reports/MCRAdvPartDEnrolData/Monthly-Contract-and-Enrollment-Summary-Report    (last visited October 1, 2023)

simply because it "did not know that the other coverage existed." 42 C.F.R. § 411.21.

7.      To ensure that Medicare would be reimbursed, Congress provided the United States government a cause of action to obtain reimbursement from a primary plan. *See* 42 U.S.C. § 1395y(b)(2)(B)(iii). When that addition proved insufficient to ensure primary payers such as insurance carriers were reimbursing Medicare, Congress enacted a private cause of action so that persons and private entities could recover conditional payments made by Medicare (and, later on, MAOs) when insurers failed to reimburse Medicare and MAOs for the payments made for expenses that were covered by their insurance policies. Congress provided for double damages so that private litigants would be incentivized to pursue a recalcitrant insurer.  This has become even more important as each year that passes more Medicare beneficiaries are opting for Medicare Part C.

8.      Compliance with the MSP Act should lead to tremendous savings for the Medicare program. In 2021, minimal compliance by primary payers resulted in approximately $9.7 bullion in savings. However, that's just the tip of the iceberg. According to an industry white paper, approximately 8 to 10% of all healthcare expenditures are related to some type of accident.[3] When a Medicare beneficiary is involved in an automobile accident, the beneficiary will almost always be insured for medical expenses either under the beneficiary's own auto insurance policy or under the policy of another driver. However, as authorized by the MSP Act, Medicare frequently ends up conditionally paying the privately covered medical expenses first. Accordingly, with expenditures over $700 billion, one should expect Medicare and MAOs to be able to recover at least something within range of 8% expenditures, which would amount to tens of billions of

---

[3] https://www.optum.com/content/dam/optum3/optum/en/resources/white-papers/StrengtheningPaymentIntegrity-SubrogtaionInjuryCoverageWhitePaper.pdf, p. 2 (last visited October 1, 2023).

dollars. Recoveries, however, are not even remotely close to those amounts because auto insurers have systematically disregarded their duty to comply with their obligations under the MSP Act.[4]

9.    Through years of investigation, including sending thousands of coordination of benefits letters to auto insurers across the country, Plaintiff has uncovered two strategies adopted by insurers that have contributed to the depletion of Medicare's trust funds by enabling insurers to evade their primary payer obligations. First, auto insurers, including Defendants, have done very little to identify or coordinate with MAOs who have made conditional payments, much less reimburse them. Those MAOs are ultimately funded from the same trust funds as Medicare.

10.    Second, auto insurers, including Defendants, fail to properly report to Medicare their primary payer tatus and related information as mandated by Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007, PL 110-173 ("Section 111 reporting"). Through Section 111, on a quarterly basis, insurers are supposed to share data with Medicare that allows Medicare to determine whether it made a secondary payment that was in fact the responsibility of another insurer—the primary payer. However, auto insurers, including the Defendants, fail to gather the necessary Medicare information from the injured person or act on the data contained in bills sent to insurers by healthcare providers and, therefore, do not submit the information to Medicare as mandated by Section 111. This failure is either due to insurers, including the Defendants, having flawed systems and faulty data or the result of a purposeful effort by them to hide the insurers' primary status from Medicare and MAOs. Without a proper Section 111 report, Medicare—and ultimately MAOs—frequently do not know that they are secondary payers and do

---

[4] https://www.tucsonsentinel.com/opinion/report/043023_gonzales_medicare_op/gonzales-pursuing-more-insurance-reimbursements-would-bolster-medicare-funding/ (last visited October 1, 2023) (opinion piece by Arizona State Senator Sally Gonzales observing that the insurance industry is "costing taxpayers billions yearly and putting Medicare at risk" and the MSP Act should be vigorously enforced "so that Medicare has the funding that it needs.").

not know who the primary payer is.

11.    The auto insurers' strategies, including the Defendants, have harmed and will continue to harm Medicare and MAOs across the country.

12.    For that reason, this action seeks to enforce the MSP Act through the Act's private cause of action—enacted specifically to overcome insurers' resistance—by requiring the Defendants to do what the MSP Act Mandates: identify and reimburse conditional payments made by one of the largest MAOs in the country when Defendants were the primary payer. That MAO ("the MAO assignor") assigned its conditional payment recovery rights to Plaintiff to bring this action.

## PARTIES, JURISDICTION, AND VENUE

13.    Plaintiff Series 15-09-321 is a Delaware series limited liability company with a principal place of business located at 2701 S. Le Jeune Road, 10th Floor, Coral Gables, Florida 33134. Series 15-09-321 is the ultimate assignee of the MAO Assignor's rights to recovery.

14.    Defendant The Hartford Financial Services Group, Inc. is, upon information and belief, a financial holding company for a group of insurance subsidiaries that issue property and casualty, liability, and no- fault policies, with its principal place of business at One Hartford Plaza, Hartford, Connecticut 06155. However, as detailed *infra*, Plaintiff believes Defendant The Hartford Financial Services Group, Inc. has itself also issued insurance policies under the name "The Hartford" or "Hartford Insurance."

15.    Defendant Hartford Accident and Indemnity Company is a company that issues property and casualty insurance policies, with its principal place of business at One Hartford Plaza, Hartford, Connecticut 06155.

16.    Defendant Hartford Fire Insurance Company is a company that issues property and casualty insurance policies, with its principal place of business at One Hartford Plaza, Hartford, Connecticut 06155.

17.    Defendant Hartford Insurance Company of the Midwest is a company that issues liability and no-fault policies, with its principal place of business at 501 Pennsylvania Parkway, Suite 400, Indianapolis, Indiana 46280.

18.    Defendant Hartford Insurance Company of the Southeast is a company that issues property and casualty insurance policies, with its principal place of business at One Hartford Plaza, Hartford, Connecticut 06155.

19.    Defendant Hartford Underwriters Insurance Company is a company that issues property and casualty insurance policies, with its principal place of business at One Hartford Plaza, Hartford, Connecticut 06155.

20.    Defendant Twin City Fire Insurance Company is a company that issues property and casualty insurance policies, with its principal place of business at One Hartford Plaza, Hartford, Connecticut 06155.

21.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331.

22.    Venue is proper in this District pursuant to 28 U.S.C. §1391 (b), (c), and (d) because at all times material hereto, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the alleged activity affecting trade and commerce discussed below has been carried out in this District.

23.    This Court has personal jurisdiction over Defendants because Defendants are at home in this forum, and personal jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

## THE MEDICARE ADVANTAGE PROGRAM

24.    Medicare enrollees may elect to receive their benefits in own of two ways. First, they may receive their benefits under the traditional Medicare Parts A and B. Known as the Medicare "fee for service" option Parts A and B provide hospital insurance and coverage for medically necessary outpatient and physician services. 42 U.S.C. § 1395w-21(a)(1)(A). Under Parts A and B, government contractors pay for Medicare enrollees' expenses directly on a fee-for-service basis. Alternatively, under Medicare Part C, Medicare enrollees may receive their Medicare benefits from private health insurers called Medicare Advantage Organizations or MAOs. 42 U.S.C. § 1395w-21(a)(1)(B).

25.    Congress enacted the Part C "Medicare Advantage" option in 1997 after experts had come to realize that the Parts A and B "fee for service" payment structure encouraged healthcare providers to order more tests and procedures than medically necessary. Through Medicare Advantage, Congress intended to "enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.).

26.    Each MAO contracts individually with the Secretary of Health and Human Services. 42 U.S.C. § 1395w-27. Under that contract, the MAO receives a fixed amount per enrollee based on the plan's enrollees' risk factors and other characteristics rather than payment of a fee for specific services performed. The MAO must then provide at least the same level of benefits that enrollees would receive under the fee-for-service Medicare Plan A and B option. *See*

*id.* at § 1395w-22. By paying MAOs a fixed amount per enrollee—called a "capitation" payment system—Congress sought to safeguard public dollars while improving the quality of care.

27.     Under a capitation-based system, the MAO provides Medicare benefits in exchange for the fixed monthly fee per person enrolled in the program regardless of actual healthcare usage. MAOs are thus incentivized to provide health insurance more efficiently than under the fee-for-service model. Not only does the Medicare Advantage program stimulate cost savings for the Medicare Trust Fund, but it also promotes creation of additional benefits for Medicare-eligible individuals: "[C]ost savings for the Medicare Trust Fund was not Congress's only goal when it created the MA program. Congress structured the program so that MAOs would compete for enrollees based on how efficiently they could provide care to Medicare-eligible individuals." *In re Avandia*, 685 F.3d at 365.

28.     Achievement of Congress's goals in enacting Medicare Advantage is, however, dependent on MAOs being able to achieve cost savings—like Medicare—through enforcement of the MSP Act by ensuring primary payers, such as the Defendants in this case, have reimbursed the MAOs for payments of medical expenses that should have been paid by the insurers who charged premiums specifically to cover those expenses. *In re Avandia*, 685 F.3d at 363. When MAOs achieve cost savings by recovering conditional payments from primary payers, they can bid to cover Medicare-eligible individuals at an amount lower than CMS's benchmark, which then allows CMS to deposit part of the savings into the Medicare Trust Fund. The MAOs' which then allows CMS to deposit part of the savings into the Medicare Trust Fund. The MAOs' cost savings also allow MAOs to offer "additional benefits to enrollees not covered by traditional Medicare." *Id.* at 365. While conditional payments recovered by MAOs do not go to Medicare directly, the payments by primary payers do reduce costs, and those savings are passed on to Medicare through

reduced costs or to the beneficiaries through expanded services. *See* 42 U.S.C. § 1395w-23.

29.    Even though MAOs have parity of recovery rights with Medicare, insurers such as the Defendants have—for more than two decades—continued to disregard their reimbursement obligations to MAOs. That failure, which blocks achievement of Congress' cost-saving goals, depletes the Medicare Trust Funds that support Medicare Advantage under Part C—the same funds supporting traditional Medicare under Parts A and B. 42 U.S.C. § 1395w-23(f). Consequently, Congress's mandate that Medicare shall not be the entity primarily footing the bill is still a long way from being realized. Litigation, such as this, ensures that MAOs can recover from primary payers efficiently to reach the goals of the MA program.

30.    This litigation seeks to reconcile, in an accurate, structured, and equitable way, claims for reimbursement Defendants have owed for years to the MAO Assignor.

## DEFENDANTS' DUTIES TO REPORT PRIMARY PAYER OBLIGATIONS

31.    Defendants are property and casualty insurers in the business of collecting premiums in exchange for taking on risk that they will have to pay for personal and property damage resulting from covered events. Collectively, Defendants offer insurance products in all 50 states and the District of Columbia that have inevitably given rise to an MSP Act obligation to repay conditional payments made by Plaintiff's MAO Assignor in those states. As a result, Defendants are tasked with having the proper systems in place to be able to (a) identify Medicare beneficiaries making claims under Defendants' policies and (b) properly report them to CMS under section 111 as required by law.

32.    Defendants underwrite automobile liability policies that include first-party and third-party medical coverage. A first-party insurance policy referred to the policy of the injured person. A third-party insurance policy refers to the property and bodily injury policy covering the

person or entity who was responsible for the automobile accident. First-party medical coverage includes Personal-Injury-Protection ("PIP") policies that are usually issued pursuant to a state no-fault statute or provide Medical Payments Coverage ("MedPay") found in a first-party policy. The first-party policy can also, and in most instances does, contain bodily injury coverage. Third-party coverage includes coverage under a third-party liability policy and coverage under the uninsured motorist and/or underinsured motorist coverage provisions of a first-party insurance policy. This coverage pays for medical expenses arising out of an automobile accident that was the fault of a third party where the third party has no coverage or insufficient coverage to pay the claims of the injured party.

33.    Defendants have primary payer obligations under the MSP Act to reimburse MAOs such as Plaintiff's MAO Assignor for medical expenses arising out of an automobile accident involving a Medicare beneficiary in three general situations involving both first-party and third-party policies:

(1)    **Contractual**: When Defendants have a contractual obligation to pay under a first-party policy such as for PIP or MedPay;

(2)    <u>**Settlement**: When Defendants settled a bodily injury claim made against a third party under either a third-party liability policy or under the uninsured or underinsured motorist coverage provisions of a first-party policy; and</u>

(3)    <u>**Hybrid Situations**: Where an accident renders Defendants a primary payer under both a contractual and a settlement-based obligation, such as where an auto accident gives rise to claims under both first-and third-party insurance policies.</u>

**A.    <u>First Party Policy Claims: First-Party Policy Medical Coverage</u>**

34.    Defendants are primary payers when they have issued an insurance policy that provides for first-party medical coverage that pays the reasonable and necessary medical expenses that an insured (or a passenger) incurred due to injuries sustained in an accident, regardless of fault. 42 U.S.C. § 1395y(b)(2)(A). The type of first-party medical coverage varies state by state. Some states require PIP coverage while other states provide for optional MedPay coverage. A few

states have both PIP and MedPay available.

35.     Although subject to change among the years at issue (and by no means exhaustive), the following states currently have no-fault statutes requiring mandatory PIP coverage:

- **<u>Florida:</u>** Florida Statute § 627.736 requires a minimum of $10,000.00 in no-fault medical benefits per person;

- **<u>Hawaii:</u>** Hawaii Revised Statutes § 431:10C-103.5 requires a minimum of $10,000.00 in no-fault medical benefits per person;

- **<u>Kansas:</u>** Kansas Statutes § 40-3103 requires a minimum of $4,500.00 in no-fault medical benefits per person;

- **<u>Kentucky</u>**: Kentucky Revised Statute § 304.39-020 requires a minimum of $10,000.00 in no-fault medical benefits per person;

- **<u>Massachusetts</u>**: Massachusetts General Laws 90 § 34A requires a minimum of $8,000.00 in no-fault benefits per person;

- **<u>Michigan</u>**: Michigan Compiled Laws § 500.3107 requires mandatory no-fault coverage at an amount to be selected by the insured;

- **<u>Minnesota</u>**: Minnesota Statutes § 65B.44 requires a minimum of $40,000.00 in no-fault medical benefits per person;

- **<u>New Jersey</u>**: New Jersey § 39:6A-4.3 requires a minimum of $15,000.00 in no-fault medical benefits per person;

- **<u>New York</u>**: 28 Consolidated Laws of New York § 5102 requires a minimum of $50,000.00 in no-fault benefits per person;

- **<u>North Dakota</u>**: North Dakota Century Code § 26.1-41-01 requires a minimum of $30,000.00 in no-fault benefits per person;

- **<u>Pennsylvania</u>**: 75 Pennsylvania Consolidated Statutes § 1711 requires a minimum of $5,000.00 in no-fault medical benefits per person; and

- **<u>Utah</u>**: Utah Code § 31A-22-307 requires a minimum of $3,000.00 in no-fault benefits per person;

36.     In addition, although Oregon is not a no-fault state, it requires $15,000.00 per person in PIP medical benefits.

37.     In the remaining states (other than Oregon) that are considered "at-fault" states because they do not have mandatory no-fault coverage, insureds in some states have the option to purchase PIP coverage or some form of medical payments coverage (such as in Arkansas, Maryland, South Dakota, Texas, Virginia, and Washington). In all other states, they may purchase MedPay, which also pay medical benefits regardless of who was at fault in the accident. MedPay is mandatory in Maine ($2,000.00 in medical benefits) and in New Hampshire if the New Hampshire resident purchases auto insurance, which is not mandatory ($1,000.00 in medical benefits). In addition, Pennsylvania allows individuals to opt out of no-fault insurance in which case the insured must purchase $5,000.00 in MedPay coverage.

38.     For purposes of this Complaint, "First Party Policy Claims" will refer to those instances in which the MAO Assignor made accident-related conditional payments on behalf of a Medicare beneficiary that was also an insured under a first-party policy that provided medical payments regardless of fault such as PIP or MedPay.

### B.    Settlement Claims: Third-Party Bodily Injury Coverage Where Defendants Settled A Liability Claim

39.     When a Medicare beneficiary is injured in an accident that is the responsibility of a third party, Defendants may be the insurer of the third party or may be responsible under the Medicare beneficiary's own policy by virtue of uninsured or underinsured motorist bodily injury policies ("UM" and "UIM" policies). Defendants have no obligation to pay benefits under the third-party policy or the UM/UIM policies unless the third party was "at fault."

40.     Although the most common types of policies where third-party liability claims arise are bodily injury liability policies or UM/UIM policies, third-party liability policies can also include umbrella coverage, which are policies that may include coverage for medical expenses that the insured is legally obligated to pay in excess of no-fault or medical-payments coverage, bodily injury policy limits, or UM/UIM coverage. Defendants also offer insurance coverage under

commercial or personal policies considered as general liability or homeowner policies.

41.     Under any of these policies, if Defendants choose to settle the Medicare beneficiary's claims, including medical expenses, arising out of the accident for which the third party was responsible or if a judgment or arbitration award is entered in the Medicare beneficiary's favor with respect to claims covered by Defendants' policy, then the Defendants are the responsible primary payer under the MSP Act.

42.     For purposes of this Complaint, "Settlement Claims" refers to those instances when the MAO Assignor made accident-related conditional payments on behalf of a Medicare beneficiary who made a claim either against a third-party liability policy or under the beneficiary's own UM/UIM coverage, and Defendants' compromised that claim through a settlement, including settlements arising out of a judgment or arbitration award or otherwise made a payment that would be the functional equivalent of a settlement or judgment to cover medical expenses incurred as a result of a specific incident or accident.

### C.     Defendants' Obligations Once They Become a Primary Payer

43.     For both "First Party Policy Claims" and "Settlement Claims," Defendants are charged with two duties under the MSP Act: (1) to report its primary payer status under Section 111, and (2) to reimburse Medicare within 60 days of receiving a primary payment. The primary plan "must reimburse Medicare even though it has already reimbursed the beneficiary or other party." 42 U.S.C. § 1396y(b)(2)(B)(ii); 42 C.F.R. § 411.24(i)(1). If Defendants fail to reimburse within 60 days, the MSP Act automatically gives rise to a right to bring an action such as this one. In conjunction with these two duties, it is also a Primary Payer's obligation to identify its beneficiaries who are simultaneously Medicare beneficiaries in order to report and reimburse in accordance with the MSP Act.

44.      Section 111 amended the MSP Act to aid Medicare in the detection of alternative sources of insurance coverage by requiring primary plans—on their own initiative—to "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program under this subchapter on any basis"—i.e., including under Medicare Advantage—and "if the claimant is determined to be so entitled," to report the claim to the Secretary. 42 U.S.C. § 1395y(b)(8)(A)-(C).

45.      The insurer's Section 111 report must provide "notice about [its] primary payment responsibility and information about the underlying MSP situation" to the Medicare payer. 42 C.F.R. § 411.25.

46.      "The notice must describe the specific situation and the circumstances (including the particular type of insurance coverage as specified in § 411.20(a)) and, if appropriate, the time period during which the insurer is primary to Medicare." 42 C.F.R. § 411.25(a)-(c).

47.      Consequently, to submit a Section 111 report, an auto insurer like Defendants must obtain certain data from the individuals making first- and third-party insurance claims. The data that must be obtained and reported includes:

- Medicare Beneficiary Information:

  - Beneficiary name, address, sex, and date of birth
  - Beneficiary health insurance claim number (i.e., Medicare beneficiary identification number or "HIC" number)
  - Social security number (if known)

- Medicare Claim Information

  - Date of accident, injury, or illness
  - Provider of service
  - Amount of Medicare payment (if known)
  - Date of Service
  - Date of Medicare payment (if known)

- Insurer, Employer, or Administrator Information:

- ▪ Policyholder name and address
- ▪ Name and address of insurer or administrator
- ▪ Policy identification number or other identifier
- ▪ Individual case identifiers used by third party payer (if applicable)
- ▪ Name and phone number of insurer or administrator contact person
- ▪ Workers' compensation agency claim number (if applicable)
- ▪ Court case or docket numbers (if applicable)
- ▪ Beneficiary's attorney's name, address, and phone number (if known and applicable)
- ▪ Name, address, and phone number of employer
- ▪ Date and amount of payment made by the insurer (specify whether undisputed payment, settlement of disputed claim, or judgment)
- ▪ Whether, under the plan of insurance, payment was considered to be a primary or secondary payment
- ▪ Payee name and address

*Medicare Program; Medicare Secondary Payment,* 59 Fed. Reg. 4285-01, 4287 (Jan. 31, 1994).

48. More specifically, where Defendants accept coverage under a first-party insurance policy—such as for PIP or MedPay coverage—Defendants have what is called an Ongoing Responsibility for Medicals ("ORM"). ORM is an entity's "responsibility to pay, on an ongoing basis, for the injured party's (the Medicare beneficiary's) 'medicals' (medical care) associated with a claim. Typically, ORM only applies to no-fault and workers' compensation claims." CMS Section 111.1 NGHP User Guide, Chapter III, Policy Guidance, Version 7.0, Chapter 2: Introduction and Important Terms; *see also* Chapter 6: Responsible Reporting Entities § 6.3.

49. On the other hand, when Defendants settle an accident-related claim based on third-party liability with someone entitled to Medicare benefits, it has what is called a Total Payment Obligation to the Claimant ("TPOC"). The CMS Section 111 NGHP User Guide states that a TPOC "refers to the dollar amount of a settlement, judgment, award, or other payment in addition to or apart from ORM. A TPOC generally reflects a 'one-time' or 'lump-sum' settlement, judgment, award, or other payment intended to resolve or partially resolve a claim. It is the dollar amount of the total payment obligation to, or on behalf of the injured party in connection with the

settlement, judgment, award, or other payment." Chapter III: Policy Guidance, Version 7.0, Chapter 2: Introduction and Important Terms; *see also* Chapter 6: Responsible Reporting Entities § 6.4.

50.     When Defendants have either ORM or TPOC, it is a "Responsible Reporting Entity" or "RRE" under federal law and are required to submit a Section 111 report. To submit the report, Defendants must first query the Medicare eligibility database to determine whether the claimant is a Medicare beneficiary. CMS's Benefits Coordination & Recovery Center ("BCRC") gives reporting entities two query methods. Because of Defendants' size, they must submit requests using a "Query Input File" that will be answered in fourteen days.

51.     When uploading a Query Input File with the BCRC to determine whether a claimant is a Medicare beneficiary, the query record submitted for each claimant must contain five data elements related to the claimant: (1) Social Security Number ("SSN") or Medicare ID; (2) the first 6 characters of the claimant's last name; (3) the first initial of the claimant's first name; (4) the claimant's date of birth; and (5) the claimant's gender. Names must be submitted exactly as they appear on the individual's Social Security or Medicare card, including spaces, hyphens, and apostrophes. *Id.* at 26.

52.     These five pieces of information are *required* to determine a claimant's entitlement to Medicare benefits and must be gathered by Defendants for submission to the BCRC.[5] CMS requires all five of the data elements because "the matching process depends on the quality of the data submitted. It is difficult to get a match if the input data is incorrect or invalid."[6]

53.     For the BCRC to find a match in the Medicare database, there must be an exact

---

[5] CMS, MMSEA Section 111 Liability Insurance (including Self-Insurance), No-Fault Insurance, and Workers' Compensation, Query File, January 9, 2023, page 23.
[6] *Id.* at 25.

match on either: (1) the Medicare ID or the full SSN, and three out of the four remaining fields; or (2) the partial SSN (last five digits) and all four remaining fields. Thus, when fewer than three out of the last four criteria match (i.e., the first initial of the first name, first six characters of the last name, date of birth, and gender), the RRE will not receive a match even if the submitted Medicare ID or SSN in fact matches that of a Medicare beneficiary.

54.     If that claimant is indeed a Medicare beneficiary, Defendants must provide Section 111 report to CMS "*after* the claim is resolved [by Defendants] through a settlement, judgment, award, or other payment (regardless of whether or not there is a determination or admission of liability)." 42 U.S.C. § 1395y(b)(8)(A)(ii) (emphasis added). In other words, once Defendants enter into a settlement with or make a payment to or on behalf of a Medicare-eligible beneficiary (and not before), it must file the mandatory Section 111 report.

55.     By making a payment on behalf of or entering into a settlement with a Medicare beneficiary in connection with the Medicare beneficiary's accident-related claim, Defendants demonstrate it is the "primary plan" as to that claim. A primary plan must reimburse Medicare or MAOs for their conditional payments when it is demonstrated that the primary plan has or had responsibility to make payment with respect to such item or service, a   primary plan's responsibility for payment may be shown by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured.

## DEFENDANTS' FAILURE TO COMPLY WITH THE MSP ACT

56.     For numerous years, and continuing through the present, Defendants' have failed to comply with its duty to gather the necessary information from the claimants to enable it to

submit all the required data elements to CMS so that it can identify for Defendants those claimants entitled to Medicare benefits. This habitual failure frequently results in Defendants making no Section 111 submission at all. When Defendants fail to make a Section 111 report, Medicare and MAOs do not have the requisite information needed to identify a primary payer and to seek reimbursements for conditional payments.

57.     Upon information and belief, Defendants track their compliance with Section 111 through periodic audits conducted to evaluate their success at collecting and submitting complete data sets for claimants.

58.     Upon information and belief, the audit reports show Defendants fail to consistently comply with Section 111. Upon further information and belief, those reports are shared with Defendants' upper management and establish Defendants' knowledge that they do not fully comply with their duties to identify Medicare beneficiaries and, as a result, fail to reimburse claims conditionally paid by Medicare or MAOs.

59.     Defendants' failure to obtain the necessary data points to determine a claimant's Medicare eligibility, whether intentional or unintentional, results in significant under-reporting and, correspondingly, the inability of Medicare or MAOs to uncover all the instances in which Defendants owe reimbursement of conditional payments. Defendants are aware of their obligations under the MSP Act to "determine whether a claimant (including an individual whose claim is unresolved) is entitled to benefits under the program bunder this subchapter on any basis," and has access to the necessary data to make this determination. In fact, in most instances, Defendants have the requisite data points in their systems to make this determination and report their primary payer status pursuant to Section111 and, to the degree they do not, are aware of their affirmative statutory duty to obtain that information.

60.     Upon information and belief, Defendants fail to properly report hundreds of reimbursable claims nationwide. Plaintiff compared the claims data it received from its MAO Assignor to publicly available motor vehicle accident reports to identify instances where Medicare beneficiaries appear to have been involved in crashes. Plaintiff then took that pool of beneficiaries and compared them to Section 111 reports made by Defendants. Upon completion of that comparison, there are numerous instances where, upon information and belief, it appears Defendants either completely failed to report reimbursable claims or withdrew a prematurely filed report.

## DEFENDANTS' FAILURE TO COORDINATE BENEFITS OR COOPERATE WITH PLAINTIFF'S ATTEMPT TO COORDINATE BENEFITS

61.     Even though Defendants, as a primary payer, bear the responsibility for coordinating benefits and identifying whether Medicare or any MAO is entitled to reimbursement of conditional payments, Plaintiff attempted, prior to bringing this lawsuit, to work with Defendants to identify conditional payments made by Plaintiff's MAO Assignor that Defendants should have reimbursed. Plaintiff, through its servicer, sent out 836 coordination of benefits letters via certified mail to Defendants and devoted a tremendous amount of manpower and resources to try to work with Defendants to resolve each letter. The letters related to both First Party Policy Claims and Settlement Claims.

62.     Plaintiff identified Defendants as the likely primary payer for the conditional payments reflected in these letters based on reports that Defendants made under Section 111. Plaintiff accesses the Section 111 reports through a CMS-authorized vendor called MyAbility. MyAbility's data is drawn directly from data submitted by Defendants to CMS, either itself or through a reporting vendor Defendants hired. Accordingly, any inaccuracy or lack of specificity in the data is attributable to Defendants.

63.    Defendants, thus far, have only responded to 88 letters, barely attaining a 10% response rate. Defendants either refused to provide any information that would allow the parties to coordinate benefits as the law requires, or Defendants have denied that it had any responsibility based on purported legal defenses that have no basis in law or fact.

64.    For the First-Party Policy Claims, Plaintiff attempted to coordinate benefits for at least 466 instances in which Defendants reported under Section 111 having made a payment based on the existence of a first-party insurance policy.  Those claims corresponded with payments made by Plaintiff's MAO Assignor on behalf of Medicare beneficiaries that resided in 37 different states. The top 10 states with the number of claims made in those states are as follows:

| First Party Claims | |
|---|---|
| **State** | **Count** |
| FL | 137 |
| NY | 91 |
| WA | 27 |
| TX | 17 |
| NJ | 17 |
| CT | 16 |
| WI | 15 |
| HI | 13 |
| GA | 12 |
| NC | 12 |

65.    For the Settlement Claims, Plaintiff attempted to coordinate benefits for 370 instances in which Defendants acknowledged in a Section 111 filing that it had entered into a settlement with Medicare beneficiary enrolled with the MAO Assignor under a third-party insurance policy or UM/UIM. Those claims corresponded with payments made by Plaintiff's MAO Assignor Plan on behalf of Medicare beneficiaries that resided in 41 different states. The top 10 states with their total number of beneficiaries are as follows:

| Third Party Claims | |
|---|---|
| State | Count |
| FL | 59 |
| NC | 26 |
| NY | 25 |
| WA | 25 |
| TX | 24 |
| GA | 22 |
| CT | 20 |
| SC | 16 |
| NJ | 13 |
| AL | 12 |

66.    Plaintiff devoted significant resources in its attempt to coordinate benefits with Defendants and to avoid litigation. Plaintiff has no choice but to bring this action because its comprehensive and exhaustive efforts to coordinate and work with the Defendants outside of litigation have been unsuccessful. In fact, in their responses to Plaintiff's correspondence, Defendants have habitually stonewalled Plaintiff's effort to coordinate benefits with improper defenses to properly compensable claims. The table below summaries Defendants' responses to Plaintiff's efforts to coordinate benefits:

| | |
|---|---|
| Confirmed Settlement | 14 |
| Disclosed Beneficiary Attorney | 14 |
| Third Party Insurer Did Not Accept Liability | 8 |
| Failed to attach itemized bill | 5 |
| Statute of Limitations | 5 |
| Subro Closing Notification | 5 |
| Subrogation (Paid Lien) | 5 |
| Contesting Relatedness | 4 |
| Exhaustion | 4 |
| Member Not Covered | 4 |
| Unable to Locate Claim-Insured | 3 |
| Contesting MSP Assignment & Failed To Provide Assignment of Benefits | 2 |
| Response to MSPSCO | 2 |
| Allege State Law SOL Applies | 1 |
| Beneficiary did not report injuries | 1 |

| | |
|---|---|
| Contact Attorney Only | 1 |
| Contesting Billed Amount | 1 |
| Disclosed First Party Insurer | 1 |
| Disclosed Third Party Insurer | 1 |
| Failed to provide proper claim-policy number | 1 |
| Privileged Communication | 1 |
| Provided CMS Information | 1 |
| Recalled Emails | 1 |
| Requested W-9 | 1 |
| Response to MSP Follow-Up | 1 |
| Unable to Access Portal | 1 |

67.     Defendants also refused to share any data with Plaintiff for the purpose of identifying situations where Defendants were a primary payer but did not submit a Section 111 report—a process that numerous other carriers have agreed to explore outside of litigation. Defendants' actions in refusing to coordinate benefits are purposeful and designed to continue to conceal details of its primary payer responsibility when it has failed to submit a Section 111 report.

68.     Through this action, Plaintiff seeks to identify all instances in which Defendants had a primary payer responsibility to reimburse accident-related conditional payments made by Plaintiff's MAO Assignor. The most efficient and fair way to quantify those damages is through a process that resembles what several other carriers are already doing voluntarily. To identify undetected claims for primary payers *other than* Defendants, Plaintiff has engaged in data sharing exercises with those other primary payers, who are also property and casualty insurers, in which the parties match data to identify all the instances in which a MAO made payments that overlap with first- or third-party claim made to the insurer by a Medicare beneficiary enrolled with the MAO. This process uses matching techniques that compensate for missing data and data imperfections and is consistent with Congress's intention in enacting the MSP Act to ensure that Medicare and, ultimately, MAOs (Part C plans) are repaid in *all instances* where an insurer is

primary.[7]

69.    In fact, Defendants acknowledged that the most practical, efficient, and fair resolution of this case should be through data sharing outside of litigation, which, in Defendants words, "would enable both parties to know with more certainty where liens may exist and would establish a procedure for potential resolution of said liens." **Exhibit A**, E-mail from Maria E. Kokiasmenos, Associate General Counsel of The Hartford Financial Group (Jan. 22, 2021).

## STANDING ALLEGATIONS

### A.    Assignment Allegations

70.    Plaintiff has the legal right to pursue its MSP Act claim pursuant to a valid

---

[7] *E.g.,* **(1) Allstate Insurance Company** (*MSPA Claims 1, LLC v. Allstate Ins. Co.*, Case No. 1:17-cv-01340, D.E. 169 (N.D. Ill. Mar. 8, 2022)) (no-fault settlement exploration through data sharing); *MSP Recovery Claims 1, LLC v. Allstate Ins. Co.*, Case No. 20-cv-24140 at Dkt. No. 70 (S.D. Fla. 2020)) (bodily injury settlement exploration through data sharing), **(2) Auto-Owners Insurance Company** (*MSP Recovery Claims, Series LLC v. Auto-Owners Ins. Co.*, Case No. 17-cv-23841 at Dkt. No. 143 (S.D. Fla. 2022)) (settlement exploration through data sharing and noting in the joint report requesting dismissal that "[t]he parties believe that the best opportunity to finally resolve their disputes will be to continue engaging in a data matching process agreed to by the parties" and "this exercise is a reconciliation that be handled by the parties outside of litigation"); **(3) National General Insurance Company** (*MSP Recovery Claims, Series LLC, et al. v. Integon Nat. Ins. Co., et al.*, Case No. 20-cv-24051, D.E. 147 (S.D. Fla. 2022)) (settlement exploration through data sharing), **(4) Sentry Insurance Company** *MSP Recovery Claims, Series LLC v. Dairyland Ins. Co.*, Case No. 17-cv-23983 at Dkt. No. 91 (S.D. Fla. 2020)) (no-fault and bodily injury settlement exploration through data sharing); **(5) Grange Insurance Company** (*MSP Recovery Claims, Series LLC v. Grange Ins. Co.*, Case No. 19-cv-219 at Dkt. No. 36 (N.D. Ohio 2019)) (noting in joint report that Grange agreed to "engage in a defined claims data matching process" to explore settlement, which resulted in a global settlement); **(6) Esurance Insurance Services, Inc** (*MSP Recovery Claims Series, LLC v. Esurance Property and Casualty Co.*, Case No. 20-cv-23590 at Dkt. No. 50 (S.D. Fla. 2020)) (no-fault and bodily injury settlement exploration through data sharing); **(7) Amica Mutual Insurance Company** (*MSP Recovery Claims, Series LLC v. Amica Mut. Ins. Co.*, Case No. 20-cv-24050, D.E. 42 (S.D. Fla. May 6, 2022)) (settlement exploration through data sharing); **(8) Horace Mann Insurance Company** *MSP Recovery Claims, Series LLC v. Horace Mann Ins. Co.*, Case No. 20-cv-24419, Dkt. No. 40 (S.D. Fla. July 9, 2021)) (global settlement reached based on data sharing); **(9) 1199 SEIU National Benefit and Pension Funds** (*MSP Recovery, LLC v. 1199 SEIU Nat'l Benefit and Pension Funds*, Case No. 20-cv-1480) (global settlement reached following data sharing).

assignment agreement.[8]

71.     On December 23, 2021, Plaintiff's MAO Assignor entered into a Claims Assignment Agreement with Series 15-09-321, whereby the MAO Assignor irrevocably assigned all rights to recover payments made on behalf of its members/enrollees (the "2021 Assignment Agreement"). The 2021 Assignment Agreement expressly provides, in pertinent part:

> Assignor irrevocably assigns, transfers, conveys, sets over and delivers to Assignee any and all of Assignor's right, title, ownership, and interest in Medicare Advantage Parts A, B, and C payments owed by Responsible Parties pursuant to the MSPA, by and through the following causes of action: (1) actions stemming from the MSPA; (2) breach of contract; (3) pure bills of discovery or equivalent; (4) depositions or discovery before action as set forth by Federal Rule of Civil Procedure 27; (5) subrogation; (6) declaratory action; (7) unjust enrichment, whether known or unknown, or arising in the future (the "Claims").

2021 Assignment Agreement at 1.1.1.

72.     Consideration was exchanged by the parties in executing the 2021 Assignment and the data service agreement.

73.     The assigned "Claims" expressly exclude claims where the MAO Assignor already recovered on the claim or is currently pursuing the claim.

74.     The MAO Assignor transferred data files to Plaintiff indicating those claims where it already had recovered money and those claims where the MAO Assignor is still pursuing recoveries. Plaintiff reviewed that list prior to filing this case and conferred with the Assignor, in an abundance of caution, to confirm that the assignor (1) never recovered money for the examples set forth below and (2) is not pursuing recoveries for the examples below. Accordingly, these

---

[8] A separate data service agreement with Plaintiff's MAO Assignor contains a provision requiring that the identity of the Assignor remain confidential. Accordingly, Plaintiff has omitted the name of its assignor from this Complaint. Accordingly, Plaintiff has omitted the name of its assignor from this Complaint. Should the Court deem it necessary, Plaintiff will disclose its MAO Assignor's identity, but would request that the identity be disclosed under seal.

examples remain unpursued and unreimbursed, and not excluded, and Plaintiff have the legal right to pursue these claims.

75.     The claims set forth in this Complaint are not subject to any carveout, exclusion, or any other limitation in law or equity that would impair Plaintiff's right to bring the claim asserted in this case.

76.     This Complaint seeks recovery only for claims Plaintiff's assignor has assigned to Plaintiff through its Designated Series (Series 15-09-321). All claims at issue in this Complaint, and all claims data currently in Plaintiff's possession, were assigned to Plaintiff through the 2021 Assignment Agreement. Indeed, Plaintiff has possession of the electronic claims data for each example of non-reimbursement identified in this Complaint solely because Plaintiff's Assignor provided that data to Plaintiff pursuant to the 2021 Assignment Agreement.

### Examples Of Unreimbursed First Party Policy Party Claims And Settlement Claims

77.     Defendants, by failing to comply with the MSP Act and reimburse Plaintiff's MAO Assignor for conditional payments, has caused monetary injury to Plaintiff's MAO Assignor sufficient to establish a concrete injury in fact under Article III. Despite very little cooperation from Defendants, Plaintiff has identified from data transferred to it by the MAO Assignor and further investigation several examples of Defendants' failure to comply the MSP Act.

78.     Adhering to how CMS identifies instances of non-reimbursed conditional payments, Plaintiff analyzed the MAO Assignor's enrollment and claims data to identify situations where: (1) the MAO Assignor had a Medicare beneficiary enrollee injured in an accident, (2) Defendants filed a Section 111 report regarding that enrollee, (3) the MAO Assignor made accident-related payments on behalf of that enrollee, and (4) Defendants failed to reimburse the MAO Assignor's conditional payments. Plaintiff confirmed that Defendants either acknowledged

that the enrollee was covered by Defendants or that Defendants had entered into a settlement with the enrollee arising out of the accident.

79.    Specifically, CMS uses what is reported through Section 111 to identify whether any claims that Medicare either receives or pays are related to an automobile accident. https://www.cms.gov/files/document/mmsea-111-august-7-2023-nghp-user-guide-version-73-chapter-iv-technical-information.pdf at Section 6.2.5 (last visited October 1, 2023). CMS requires the Section 111 report to contain certain codes (called International Classification of Diseases, Ninth/Tenth Revision, Clinical Modification (ICD-9/ICD-10) that describe the "alleged illness, injury, or incident claims and/or released by the settlement, judgment, or award, or for which ORM [under a first-party coverage] is assumed." *Id*. "The ICD-9/ICD-10 codes are used by Medicare to identify claims Medicare may receive, related to the incident, for Medicare claims payment and recovery purposes." *Id*

80.    CMS provides to reporting entities, such as Defendants, a list of valid ICD codes, and that list can be accessed here: https://www.cms.gov/medicare/coordination-benefits-recovery-overview/icd-code-lists (last visited October 1, 2023). The list is segregated into those codes that are "valid" versus those that are "excluded." "Certain codes are not valid for No-Fault insurance types . . . because they are not related to the accident, and may result in inappropriately denied claims." *Id*. For all the examples of un-reimbursed secondary payments set forth in paragraphs 87 to 99 each of the accident-related payments that the MAO Assignor made on behalf of the Medicare beneficiary fall within the list of "valid" codes that CMS itself looks at when initiating recovery. In other words, CMS, as an initial matter, would consider as accident-related all the payments set forth below that the MAO Assignor made related to the accident.

81.    Moreover, with respect to the injuries that Defendants reported under Section 111,

all the injuries contained within Defendants' Section 111 reports reflect injuries that are identical, or very similar, to the injuries that resulted in health care providers providing medical items and services to the MAO enrollee and thereafter billing and collecting from the MAO Assignor. CMS's manual states that it would hold Defendants responsible for reimbursing Medicare for any payments that Medicare made for same or similar injuries.[9] In fact, CMS issued a training manual for reporting entities such as Defendants, stating that "ICD Diagnosis codes are also important for claims recovery" because "if [Defendants] [have] assumed ORM for a beneficiary's broken collar bone injury due to a no-fault policy claim, the Commercial Repayment Center (CRC) will use the submitted ICD diagnosis codes to search Medicare records for claims paid by Medicare that are related to the case."[10]

82.    Further, according to the CMS manual: "If Medicare has made primary or conditional payment on claims related to the incident that should have been paid by other insurance, the CRC will pursue recovery from the insurer for the Medicare benefits paid." *Id.* Medicare likewise would hold Defendants accountable for reimbursing any Medicare payments for injuries that resulted in the settlement of a third-party liability claim. For example, if Defendants reported that it settled a claim involving injuries such as a sprain of the neck and a sprain of the ankle, Medicare "will use this information to search Medicare claims history," "identify any claims paid primary . . . that relate to the neck and ankle sprains," and pursue recovery. *Id.* "An exact match on the submitted ICD-9 diagnosis codes . . . is not required." *Id.* As noted above and reflected below, all the injuries that Plaintiff identified are either identical, or very

---

[9] https://www.cms.gov/files/document/mmsea-111-august-7-2023-nghp-user-guide-version-73-chapter-iv-technical-information.pdf at Section 6.2.5 (last visited October 1, 2023).

[10] https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Mandatory-Insurer-Reporting-For-Non-Group-Health-Plans/NGHP-Training-Material/Downloads/ICD-Diagnosis-Code-Requirements-Part-I.pdf at p. 7 (last visited August 8, 2023).

similar, to what Defendants reported in their Section 111 reports.

83.     Additionally, for each of the examples, Plaintiff confirmed that Defendants either acknowledged that the enrollee was covered by a Defendants policy or that Defendants had entered into a settlement with the enrollee arising out of the accident. Defendants also knew or should have known that its insured was a Medicare beneficiary and therefore had constructive knowledge of its duty to reimburse the MAO Assignor.

84.     The following examples of First Party Policy Claims and Settlement Claims illustrate Defendants' failure to fulfill their statutory duties to reimburse the MAO Assignor for conditional payments when it knew that the individuals making Defendants' insurance claims were also entitled to Medicare benefits. The representative Medicare beneficiaries listed below (identified by initials for confidentiality reasons) are illustrative examples of the many claims Defendants have failed to reimburse.

85.     The scope of Plaintiff's claims is not limited to the represented beneficiaries listed below. Plaintiff's claims seek reimbursement and other relief for the thousands of conditional payments that to date remain unreimbursed by Defendants.

86.     The examples below detail the facts that demonstrate (1) the MAO Assignor made conditional payments for treatment to address injuries caused by an auto accident; (2) a Defendant was a primary plan with respect to that accident; (3) a Defendant had a demonstrated responsibility to pay or reimburse the MAO Assignor's conditional payments; and (4) a Defendant did not reimburse the MAO Assignor for its conditional payments, causing the MAO Assignor to sustain damages. For each claim below, the MAO Assignor executed an assignment to Plaintiff allowing Plaintiff to pursue the specific recovery of damages; the MAO Assignor did not retain any reimbursement rights; and Plaintiff satisfied all conditions precedent (to the extent any exist) to

bring these claims.

## **First Party Policy Claims Examples**

87.     S.R. was injured in an automobile accident on November 5, 2019. At that time, S.R. was enrolled in Plaintiff's MAO Assignor's MA Plan.

    a.  At the time of the accident, S.R. was insured by a Hartford Accident and Indemnity Company no-fault policy, having policy number 52PH449412.

    b.  As a result of the accident, S.R. suffered injuries to her brain, head, neck, and spine. On November 6, 2019, S.R. received treatment for those injuries.

    c.  S.R. received follow-up treatment for these injuries on November 8, 2019.

    d.  The automobile accident caused the injuries set forth above.

    e.  Treatment of S.R.'s injuries was reasonable and necessary.

    f.  S.R.'s medical providers billed the MAO Assignor $4,136.00 for the above accident-related treatment and the MAO Assignor paid $167.28 for treatment of S.R.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Hartford Accident and Indemnity Company reported pursuant to Section 111.

    g.  Hartford Accident and Indemnity Company's Section 111 report for S.R. admits the following details about the claims:

        i.  S.R. was insured by Hartford Accident and Indemnity Company.

        ii.  S.R.'s Medicare coverage was secondary, and S.R.'s Hartford Accident and Indemnity No-Fault Auto Insurance was primary.

        iii.  The accident caused W.T. to suffer a sprain of the ligaments of his lumbar spine.

        iv.  The Plan name was "Hartford Accident Amp; Indemnity."

88.     F.E. was injured in an automobile accident on September 12, 2019. At that time F.E. was enrolled in Plaintiff's MAO Assignor's MA Plan.

a.  At the time of the accident, F.E. was insured by a Defendant Hartford Accident and Indemnity Company no-fault policy, having policy number 55PHJ484463.

b.  As a result of the accident, F.E. suffered injuries to his neck and spine. On the same date as the accident, F.E. received treatments for those injuries.

c.  F.E. received follow-up treatment for these injuries on September 18, 2019.

d.  The automobile accident caused the injuries set forth above.

e.  Treatment of F.E.'s injuries was reasonable and necessary.

f.  F.E.'s medical providers billed the MAO Assignor $7,173.00 for the above accident-related treatment and the MAO Assignor paid $2,765.83 for treatment of F.E.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Hartford Accident and Indemnity Company reported pursuant to Section 111.

g.  Hartford Accident and Indemnity Company's Section 111 report for F.E. admits the following details about the claims:

    i.  F.E. was insured by Hartford Accident and Indemnity Company.

    ii.  F.E.'s Medicare coverage was secondary, and F.E.'s Hartford Accident and Indemnity No-Fault Auto Insurance was primary.

    iii.  The accident caused F.E. to suffer a sprain of the ligaments of his cervical spine.

    iv.  The Plan name was "Hartford Accident AMP; Indemnity."

89.     A.S. was injured in an automobile accident on April 14, 2019. At that time, A.S. was enrolled in Plaintiff's MAO Assignor's MA Plan.

a.  At the time of the accident, A.S. was insured by either Defendant Hartford Insurance Company of the Midwest or Defendant Hartford Insurance

Company of the Southeast,[11] having policy number Y79AF62305.

b. As a result of the accident, A.S. suffered injuries to her head, neck, chest, lumbar spine, thorax, pelvis, knee, and hand. On the same date of the accident, A.S. received treatment for these injuries.

c. The automobile accident caused the injuries set forth above.

d. Treatment of A.S.'s injuries was reasonable and necessary.

e. A.S.'s medical providers billed the MAO Assignor $14,136.00 for the above accident related treatment and the MAO Assignor paid $2,701.24 for treatment of A.S.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO paid for treatment of accident injuries that are either the same as, or similar to, the injuries that either Defendant Hartford Insurance Company of the Midwest or Defendant Hartford Insurance Company of the Southeast reported pursuant to Section 111.

f. Defendant Hartford Insurance Company of the Midwest or Defendant Hartford Insurance Company of the Southeast's Section 111 report for A.S. admits the following details about the claims:

   i. A.S. was insured by either Defendant Hartford Insurance Company of the Midwest or Defendant Hartford Insurance Company of the Southeast.

   ii. The accident caused A.S. to suffer an injury to her spine.

   iii. A.S.'s Medicare coverage was secondary, and A.S.'s Hartford No-Fault Auto Insurance was primary.

---

[11] Plaintiff is unable to confirm at this time which Hartford entity—Hartford Insurance Company of the Midwest or Hartford Insurance Company of the Southeast—issued the corresponding policy at issue to this particular representative beneficiary. This is as a result of the manner in which the responsible Hartford entity reported to CMS. Upon identification of which Hartford entity is the correct one, Plaintiff shall either amend this allegation or simply drop the other Hartford entity as a defendant in this matter (if appropriate).

90.    R.W. was injured in an automobile accident on August 4, 2019. At that time, R.W. was enrolled in Plaintiff's MAO Assignor's MA Plan.

    a.    At the time of the accident, R.W. was insured by a Hartford Fire Insurance Company no-fault policy, having policy number 55PHL924928.

    b.    As a result of the accident, R.W. suffered injuries to his shoulder and clavicle. On the same date of the accident, R.W. received treatment for these injuries.

    c.    The automobile accident caused the injuries set forth above.

    d.    Treatment of R.W.'s injuries was reasonable and necessary.

    e.    R.W.'s medical providers billed the MAO Assignor $5,477.78 for the above accident-related treatment and the MAO Assignor paid $296.78 for treatment of R.W.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Hartford Fire Insurance Company reported pursuant to Section 111.

    f.    Hartford Fire Insurance Company's Section 111 report for R.W. admits the following details about the claims:

        i.    R.W. was insured by Hartford Fire Insurance Company.

        ii.    R.W.'s Medicare coverage was secondary, and R.W.'s Hartford Fire Insurance Company's No-Fault Auto Insurance was primary.

        iii.    The accident caused R.W. to suffer a fracture of his left shaft of humerus.

91.    B.M. was injured in an automobile accident on September 24, 2019. At that time, B.M. was enrolled in Plaintiff's MAO Assignor's MA Plan.

    a.    At the time of the accident, B.M. was insured by was insured by either a Hartford Insurance Company of the Midwest or a Hartford Insurance

Company of the Southeast[12] no-fault policy, having policy number 55PHB757169.

b. As a result of the accident, B.M. suffered a fractured vertebra and other injuries to her chest, back, and spine. On the same date as the accident, B.M. received treatment for these injuries.

c. B.M. received follow-up treatment on October 4, 2019, October 15, 2019, October 29, 2019, November 4, 2019, and December 5, 2019.

d. The auto accident caused the injuries set forth above.

e. The treatment of B.M.'s injuries was reasonable and necessary.

f. B.M.'s medical providers billed the MAO Assignor $5,787.70 for the above accident-related treatment and the MAO Assignor paid $1,780.32 for treatment of B.M.'s accident-related injuries. The diagnosis codes contained within the bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO paid for treatment of accident injuries that are either the same as, or similar to, the injuries that either Hartford Insurance Company of the Midwest or Hartford Insurance Company of the Southeast reported pursuant to Section 111.

g. Hartford Insurance Company of the Midwest or Hartford Insurance Company of the Southeast's Section 111 report for B.M. admits the following:

   i. B.M. was insured by either Hartford Insurance Company of the Midwest or Hartford Insurance Company of the Southeast.

   ii. B.M.'s Medicare coverage was secondary, and B.M.'s No-fault

---

[12] Plaintiff is unable to confirm at this time which Hartford entity—Hartford Insurance Company of the Midwest or Hartford Insurance Company of the Southeast—issued the corresponding policy at issue to this particular representative beneficiary. This is as a result of the manner in which the responsible Hartford entity reported to CMS. Upon identification of which Hartford entity is the correct one, Plaintiff shall either amend this allegation or simply drop the other Hartford entity as a defendant in this matter (if appropriate).

Auto Insurance was primary.

    iii.  The accident caused B.M. to suffer a fractured vertebra.

92.    S.F. was injured in an automobile accident on August 6, 2019. At that time S.F. was enrolled in Plaintiff's MAO Assignor's MA Plan.

    a.  At the time of the accident, S.F. was insured by a Hartford Fire Insurance Company no-fault policy, having policy number 55PHT480038.

    b.  As a result of the accident, S.F. suffered lacerations of her legs. On the same date as the accident, S.F. received treatment for those injuries.

    c.  S.F. received follow-up treatment on August 8, 2019, August 13, 2019, August 21, 2019, September 1, 2019, September 12, 2019, September 13, 2019, and September 29, 2019.

    d.  The automobile accident caused the injuries set forth above.

    e.  Treatment of S.F.'s injuries was reasonable and necessary.

    f.  S.F.'s medical providers billed the MAO Assigner $5,048.00 for the above accident-related treatment and the MAO Assignor paid $3,371.58 for treatment of S.F.'s accident-related injuries. The diagnosis codes contained within the medical bills form the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Hartford Fire Insurance Company reported pursuant to Section 111.

    g.  Hartford Fire Insurance Company's Section 111 report for S.F. admits the following details about the claims:

        i.  S.F. was insured by Hartford Fire Insurance Company.

        ii.  S.F.'s Medicare coverage was secondary, and S.F.'s Hartford Fire Insurance Company's No-Fault Auto Insurance was primary.

        iii.  The accident caused S.F. to suffer injuries to her lower leg.

93.    J.G. was injured in an automobile accident on March 7, 2019. At that time, J.G.

was enrolled in Plaintiff's MAO Assignor's MA Plan.

    a. At the time of the accident, J.G. was insured by a Twin City Fire Insurance Company no-fault policy, having policy number 22BAVW2778.

    b. As a result of the of the accident, J.G. suffered injuries to his head, brain, and knee. On March 15, 2019, J.G. received treatment for those injuries.

    c. The automobile accident caused the injuries set forth above.

    d. Treatment of J.G.'s injuries was reasonable and necessary.

    e. J.G.'s medical providers billed the MAO Assignor $1,919.52 for the above accident-related treatment and the MAO Assignor paid $598.97 for treatment of J.G.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Twin City Fire Insurance Company reported pursuant to Section 111.

    f. Twin City Fire Insurance Company's Section 111 report for J.G. admits the following details about the claims:

        i. J.G. was insured by Twin City Fire Insurance Company.

        ii. J.G.'s Medicare coverage was secondary, and J.G.'s Twin City Fire Insurance Company's No-Fault Auto Insurance was primary.

        iii. The accident caused J.G. to suffer injuries to his knee.

**Settlement Claims Examples**

94. When Defendants enter into a settlement agreement with an injured party who is enrolled in a Medicare plan, Defendants become primary payers that are responsible for reimbursement of medical services rendered to the injured party. After executing settlement agreements in each instance identified below, Defendants failed to provide actual notice of its

primary payer status to the Medicare participants who paid for the beneficiaries' medical expenses and failed to reimburse the MAO Assignor for its conditional payments.

95.    D.G. was injured after she slipped and fell on July 24, 2019 at BB&T Corp. At that time, D.G. was enrolled in Plaintiff's MAO Assignor's MA Plan.

a.    BB&T Corp. was insured by a Defendant Hartford Fire Insurance Company, having a liability policy under policy number 22CSES44603.

b.    The slip and fall caused D.G. to suffer injuries to her head, neck, shoulder, elbow, hand, spine, lower back, knee, and feet. On the same date of the slip and fall, D.G. received treatment for those injuries.

c.    Follow-up treatment related to these injuries continued until July 31, 2019.

d.    The slip and fall caused the injuries set forth above.

e.    Treatment of D.G.'s injuries was reasonable and necessary.

f.     D.G.'s medical providers billed the MAO Assignor $29,385.10 for the above slip and fall-related treatment and the MAO Assignor paid $1,337.21 for treatment of D.G.'s slip and fall-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the slip and fall-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Defendant Hartford Fire Insurance Company reported pursuant to Section 111.

g.    D.G. filed a third-party claim against the liability policy of the Hartford Fire Insurance Company's insured, seeking as damages reimbursement of

medical expenses incurred by the MAO Assignor for the slip and fall-related injuries set forth above.

h. Hartford Fire Insurance Company settled D.G.'s liability claim for $50,000.00 on November 11, 2022.

i. Hartford Fire Insurance Company's Section 111 report for D.G. admits the following details about the claims:

    i. The settling party was Hartford Fire Insurance Company's insured.

    ii. D.G.'s Medicare coverage was secondary.

    iii. The applicable Plan name was Hartford Fire Insurance Company.

96.    C.B. was injured while at work on January 21, 2018. At that time, C.B. was enrolled in Plaintiff's MAO Assignor's MA plan.

a. C.B.'s employer was insured by Hartford Underwriters Insurance, having a workers compensation policy under policy number 12WEGDR6544.

b. The incident at work caused C.B. to suffer injuries to his head and brain. On January 21, 2018, C.B. received treatment for those injuries.

c. The incident at work caused the injuries set forth above.

d. Treatment of C.B.'s injuries was reasonable and necessary.

e. C.B.'s medical providers billed the MAO Assignor $5,182.78 for the above work-related medical treatment and the MAO Assignor paid $627.21 for treatment of C.B.'s work-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the work-related medical treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of work-related injuries that are either the same as, or similar to, the injuries that Defendant Hartford Underwriters Insurance reported pursuant to Section 111.

f.  C.B. filed  a claim against the workers compensation policy of Hartford Underwriters Insurance's insured, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the work-related injuries set forth above.

g.  Hartford Underwriters Insurance settled C.B.'s workers compensation claim on April 13, 2020.

h.  Hartford Underwriters Insurance's Section 111 report for C.B. admits the following details about the claims:

   i.  The settling party was Hartford Underwriters Insurance's insured.

   ii.  C.B.'s Medicare coverage was secondary.

97.    M.P. was injured in an automobile accident on July 26, 2017, in Myrtle Beach, South Carolina. At the time of the accident, M.P. was enrolled in Plaintiff's MAO Assignor' MA Plan.

a.  The auto accident caused M.P. to suffer injuries to her neck. On the same date as the accident, M.P. received treatment for those injuries.

b.  The auto accident caused the injuries set forth above.

c.  Treatment of M.P.'s injuries was reasonable and necessary.

d.  M.P.'s medical providers billed the MAO Assignor $180.29 for the above accident-related treatment and the MAO Assignor paid $112.63 for treatment of M.P.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that Defendant Hartford Insurance Company

reported pursuant to Section 111.

e. M.P. sued Hartford Insurance Company in South Carolina's Court of Common Pleas for the Fifteenth Judicial Circuit, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

f. Hartford Insurance Company settled M.P.'s claim on September 9, 2019.

g. Hartford Insurance Company's Section 111 report for M.P. admits the following details about the claims:

    i. The settling party was Hartford Insurance Company's insured.

    ii. M.P. Medicare coverage was secondary.

    iii. The accident caused M.P. to suffer injuries to her thorax.

98. S.L. was injured in an automobile accident on September 30, 2018. At the time of the accident, S.L. was enrolled in Plaintiff's MAO Assignor's MA Plan.

a. The accident caused S.L. to suffer injuries to her thorax, chest, and right thigh. On the same date as the accident, S.L. received treatment for those injuries.

b. Follow-up treatment continued on October 4, 2018, October 9, 2019, and October 30, 2019.

c. The auto accident caused the injuries set forth above.

d. Treatment of S.L.'s injuries was reasonable and necessary.

e. S.L.'s medical providers billed the MAO Assignor $30,490.70 for the above accident-related treatment and the MAO Assignor paid $4,237.50 for treatment of S.L.'s accident-related injuries. The diagnosis codes contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as,

or similar to, the injuries that Defendant Hartford Insurance Company reported pursuant to Section 111.

f.  S.L. filed a third-party claim against Hartford Insurance Company's liability policy, seeking as damages reimbursement of medical expenses incurred by the MAO Assignor for the accident-related injuries set forth above.

g.  Hartford Insurance Company's Section 111 report for S.L. admits the following details about the claims:

   i.  The settling party was Hartford Insurance Company's insured.

   ii.  S.L. Medicare coverage was secondary.

   iii.  The accident caused S.L. to suffer injuries to her spine, thorax, back, and shoulder.

### Example of Unreported Claim

99.  M.S. was injured in an automobile accident on November 5, 2018. At that time, M.S. was enrolled in Plaintiff's MAO Assignor's MA Plan.

a.  The auto accident caused M.S. to suffer injuries to her chest, back, and shoulder. On the same date as the accident, M.S. received treatment for those injuries.

b.  Follow-up treatment continued on November 6-22, 2018, November 30, 2018, and December 3, 2018.

c.  The auto accident caused the injuries set forth above.

d.  Treatment of M.S.'s injuries were reasonable and necessary.

e.  M.S.' medical providers billed the MAO Assignor $146,109.38 for the above accident-related treatment and the MAO assignor paid $34,339.60 for treatment of M.S.' accident-related injuries.  The diagnosis codes

contained within the medical bills from the medical providers, relating to the accident-related treatments, are on the list of valid CMS codes. Moreover, the MAO Assignor paid for treatment of accident injuries that are either the same as, or similar to, the injuries that were reported pursuant to Section 111.

    f. A Section 111 report for M.S. was made by State Farm Insurance company, which provided:

        i. M.S. is insured by Policy Number 596456D84.

        ii. The auto accident caused M.S. to suffer injuries to her thorax.

        iii. M.S.' Medicare Coverage was secondary, and the no-fault insurance, including Auto was primary.

        iv. The Plan name was State Farm.

    g. On April 18, 2023, Plaintiff sent a demand letter to State Farm Group.

    h. On July 15, 2022, State Farm Group sent a response and advised that M.S. was insured with Hartford Insurance at the time of the loss.

    i. There is no evidence that Defendants made a Section 111 report for M.S.' claim.

100. The cross-referencing exercise Plaintiff undertook to identify the above examples is successful in identifying some unreimbursed conditional payments. However, the bulk of those payments remain hidden without cooperation by The Defendants. Since the Defendants have been unwilling to comply with its Congressionally-mandated obligations to determine when it is a primary plan under the MSP Act and ensure that it has reimbursed all conditional payments, this litigation is necessary to ensure current and future compliance with the MSP Act. There can be little doubt that the examples alleged above are merely the tip of the iceberg, and that thousands

of other instances exist in which the Defendants has accepted premiums to cover medical expenses arising out of automobile accidents but has chosen to let Medicare and MAOs pick up the tab.

101.    The Defendants refusal to accept their Congressionally-mandated obligation to reimburse MAOs' conditional payments—instead pocketing premiums charged to cover the expenses it lets the MAOs pay—has led to this lawsuit.

## DEFENDANTS FAILED TO CONTEST THE REIMBURSEMENT CLAIM UNDER THE EXCLUSIVE ADMINISTRATIVE REVIEW PROCESS UNDER 42 U.S.C. §§ 405(G)-(H)

102.    When a party wants to dispute a claim by an MA plan, it must do so through the exclusive review process outlined in 42 U.S.C. 405(g) and 405(h). Section § 405(h) makes § 405(g), the Social Security program's judicial review provision, the sole avenue for judicial review of all claims arising under the Medicare Act.

103.    When an MAO gets billed for medical expenses incurred by its beneficiary after an injury in an incident, the MAO determines: (1) whether those expenses are covered under the health insurance policy; and, if so, (2) how much to pay. 42 C.F.R. § 422.566(b).

104.    The MAO's initial decision regarding coverage for a Medicare enrollee's medical expenses is called an "organization determination," which includes any reimbursement determination made by an MAO with respect to payment made by an MAO for Medicare covered services. 42 C.F.R § 422.566(b)(3).

105.    If any party wishes to challenge any aspect of an organization determination, that party must exhaust its administrative remedies by following a specific procedure for administrative appeal prescribed by the Medicare Act and its implementing regulations. 42 U.S.C. § 1395w–22(g); 42 C.F.R. §§ 422.560–422.622.

106.    Defendants failed to challenge MSP and the MAO Assignors' organization determination under the administrative process in 42 U.S.C. 405(g), and as a result, it is foreclosed from disputing the reimbursement amounts in this lawsuit, as no party timely appealed the MAO Assignors' organization determination (i.e., reimbursement determination).

107.    Thus, the amount Defendants owe is now fixed as to the universe of claims asserted in this action.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Equitable Estoppel

108.    Defendants have been under a continuous duty to identify and coordinate benefits with MAOs, including the MAO Assignor, and to provide proper notice to CMS of its primary payer status to ensure that conditional payments made on behalf of Medicare beneficiaries are reimbursed.

109.    Defendants knowingly, affirmatively, and actively concealed or recklessly disregarded their obligations to the MAO Assignor and, therefore, are estopped from relying on any statute of limitations in defense of this action.

### Fraudulent Concealment

110.    All applicable statutes of limitation have been tolled by Defendants' fraudulent concealment of its status as the primary payer for the MAO Assignor's Medicare beneficiary enrollees by: (1) intentionally failing to obtain the information needed to identify whether individuals with accident-related medical expenses covered by Defendants' policies are Medicare beneficiaries enrolled in Medicare Advantage Plans, (2) failing to properly submit Section 111 reports to CMS, and (3) failing to coordinate with MAOs or their assignors in order to evade having to reimburse conditional payments. Instead of complying with the requirements of the MSP Act

and Section 111, enacted to ensure that Medicare and now MAOs are secondary payers, Defendants have intentionally and fraudulently concealed its primary payer responsibility to avoid having to reimburse conditional payments.

111.    Virtually all residents in the United States are covered under multiple policies of insurance. These policies include health, prescription, auto, and home insurance coverage. Although the enrollment process for these policies varies between carriers and policy types, certain features are common.

112.    Auto insurers, including Defendants, ask numerous questions about the insured during policy underwriting such as the policy holder's name, address, date of birth, vehicle make and model, education level, employment information, driving history, vehicle registration, license information, accident history, and whether the insured resides with individuals of driving age.

113.    Thus, when an insured makes a claim, the claim is then assigned to a claim handler to be processed through a standardized process. One of the steps in the process is to determine— for the first time—whether the claimant is Medicare eligible. Often, the claim adjuster will rely solely on responses to written forms sent to insureds, where the insureds will self-report whether they are Medicare eligible or will provide certain demographic information so the auto insurer can query Medicare's database. However, insureds are reluctant to turn over information which results in Defendants' failure to identify and reimburse payments made by Medicare Advantage Organizations.

114.    Moreover, throughout the life of a claim, the claim handler receives additional information from other third-party sources, such as examinations under oath, police records, medical bills, and the like. Defendants, however, have no process in place to extract information from those third-party sources and use that information to either query the Medicare eligibility

database or to investigate further to learn of the insured's Part C provider. This too results in missed opportunities to identify and reimburse Medicare Advantage Organizations, including the MAO Assignor in this case.

115.    Defendants know their current system is set up to result in large amounts of conditional payments being undetectable. They are undetectable because the MSP statute and implementing regulations rely on compliance by the auto insurer to make secondary payers, i.e., Medicare or MAOs, aware of the fact that someone has a primary payment responsibility. Indeed, Section 111 and 42 C.F.R. § 411.25 were specifically designed so that auto insurers come forth with information to facilitate the coordination of benefits and reimbursement of payments owed to Medicare.

116.    Defendants' choice not to change its system and processes to result in accurate and complete coordination between itself and Medicare and MAOs amounts to fraudulent concealment that tolls the statute of limitations for all claims that Plaintiff or its MAO Assignor were unable to discover due to Defendant's fraud.

117.    Defendants may register as an RRE for itself or for any direct subsidiary in its corporate structure.[13] Further, a parent company (regardless of whether it fits the formal definition of an RRE) may register as an RRE for any subsidiary in its corporate structure.[14] Accordingly, any of Defendants' subsidiaries may also be liable to Plaintiff. As illustrated by the labyrinthine

---

[13] MMSEA Section 111 Liability Insurance (Including Self-Insurance), No-Fault Insurance, and Workers' Compensation User Guide, *available online at* https://www.cms.gov/medicare/coordination-of-benefits-and-recovery/mandatory-insurer-reporting-for-non-group-health-plans/nghp-training-material/ghp-training-material-items/responsible-reporting-entity (last visited Oct. 5, 2023)

[14] MMSEA Section 111 Liability Insurance (Including Self-Insurance), No-Fault Insurance, and Workers' Compensation User Guide, *available at* https://www.cms.gov/files/document/mmsea-111-april-24-2023-nghp-user-guide-version-71-chapter-iii-policy-guidance.pdf

organizational chart attached hereto as **Exhibit B,** Defendant The Hartford Financial Services Group, Inc's subsidiaries include Hartford Accident and Indemnity Company, Hartford Fire Insurance Company, Hartford Insurance Company of the Midwest, Hartford Insurance Company of the Southeast, and Hartford Underwriters Insurance Company.

118.    As further evidence of Defendants' concealment of information, in violation of federal law, Plaintiff attempted to coordinate benefits solely on those claims that Plaintiff could identify from reports that Defendants made under Section 111. As described above and below, Plaintiff sent hundreds of letters to better understand whether Defendants fulfilled their obligation to reimburse Plaintiff's MAO Assignor. Instead of cooperating and providing information as the law requires, Defendants refused to provide information as discussed in paragraph 65, *supra*.

119.    None of these reasons given by Defendants are valid reasons to refuse to provide information pursuant to Section 411.25. Instead, they reflect conduct that amounts to fraudulent concealment of information that Defendants are required to disclose, and that concealment tolls the statute of limitations to the extent Plaintiff was unable to identify an actionable claim because of Defendants' conduct.

## **Class Action Tolling**

120.    Any applicable statute of limitations was tolled during the pendency of a prior class action.

121.    Specifically, the claims made in this action were tolled by the pendency of the following cases:

   a.    *MSP Recovery Claims, Series LLC v. Hartford Financial Services Group, Inc., et. al.*, 20-cv-00305, filed on March 6, 2020 in the District of Connecticut and dismissed on August 22, 2022.

    b.   *MSP Recovery Claims, Series LLC v. Hartford Insurance Company of the Midwest*, 1:17-cv-24029, removed from state court to the Southern District of Florida on November 11, 2017 and voluntarily dismissed without prejudice on August 1, 2018.

    c.   *MSP Recover Claims, Series LLC v. Hartford Accident and Indemnity Company,* 1:17-cv-23858, removed from state court to the Southern District of Florida on October 20, 2017 and voluntarily dismissed without prejudice on May 3, 2018.

122.    Plaintiff is now entitled to bring all claims relating back to the filing of the above-mentioned class actions.

## CAUSES OF ACTION

### COUNT I
### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A) for Settlement Claims
### (Seeking the MAO Assignor's Unreimbursed Conditional Payments)

123.    Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-122 as if fully set forth herein.

124.    Plaintiff asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

125.    Defendants were a primary plan for the Settlement Claims.

126.    Plaintiff's MAO Assignor, as part of providing Medicare benefits under the Medicare Advantage program, paid for accident-related items and services that were reasonable and necessary and which were also covered by a third-party policy that provided bodily injury coverage for accident-related medical expenses or by a first-party policy that provided UM or UIM coverage.

127.    The MAO's Medicare beneficiaries made claims against Defendants' third-party policies to recover the medical expenses the MAO Assignor paid for items and services that were reasonable, necessary, and related to an accident. Defendants entered into settlements with the

MAO Assignor's beneficiaries relating to accidents but failed to reimburse the MAO Assignor for accident-related medical expenses paid by the Assignor.

128.    Defendants had a nondelegable duty to reimburse the MAO Assignor for payments it made for medical expenses related to an accident. Defendants are responsible for reimbursement of these accident-related medical expenses, even if it subsequently paid out the maximum benefits under the policies.

129.    Defendants have and had a demonstrated responsibility to reimburse accident-related secondary payments relating to the Settlement Claims by failed to do so causing Plaintiff's MAO Assignor damages. Defendants' responsibility to reimburse the MAO Assignor for its Settlement Claims conditional payments is demonstrated by the fact that Defendants entered into settlements with respect to the accidents with MAO Assignor's enrollees.

130.    To the extent it was necessary, Defendants failed to administratively appeal the MAO Assignor's rights to reimbursement within the administrative remedies period. Defendants, therefore, are time-barred from challenging the propriety, reasonableness, and necessity of the amounts paid.

131.    Defendants were required to timely reimburse the MAO Assignor for conditional payments of its Medicare beneficiaries' accident-related medical expenses.

132.    Defendants derived substantial monetary benefit by placing the burden of financing medical treatments on the MAO Assignor in violation of the MSP Act and to the detriment of the Medicare program.

133.    Plaintiff seeks to recoup only those medical items or services provided to the MAO Assignor's Medicare beneficiary enrollees that were related to motor vehicle accidents covered by Defendants' insurance policies.

134.    Plaintiff brings this claim pursuant to 42 U.S.C. § 1395y(b)(3)(A), for reimbursement of its MAO Assignor's secondary payments and to recover statutory double damages from Defendants for their failure to make appropriate and timely reimbursement of conditional payments for Medicare beneficiaries' accident-related medical expenses.

### COUNT II
### Private Cause of Action Under 42 U.S.C. § 1395y(b)(3)(A) for First-Party Claims
### (Seeking the MAO Assignor's Unreimbursed Conditional Payments)

135.    Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-122 as if fully set forth herein.

136.    Plaintiff asserts a private cause of action pursuant to 42 U.S.C. § 1395y(b)(3)(A).

137.    Defendants were the primary plan for the First-Party Claims.

138.    Defendants have a demonstrated responsibility to reimburse accident-related secondary payments relating to the First-Party Claims but failed to do so.

139.    With respect to the First Party Policy Claims, the MAO Assignor, while providing Medicare benefits under the Medicare Advantage program, paid for accident-related medical items and services that were reasonable and necessary and that were also covered by no-fault, PIP, or MedPay policies issued by Defendants that provided medical coverage for accident-related medical expenses. The MAO Assignor's payments were conditional payments.

140.    Defendants' responsibility to reimburse the MAO Assignor for its First Party Claims conditional payments is demonstrated by either the issuance of the policy providing coverage of the MAO Assignor's enrollees or by Defendants assuming ongoing responsibility for the medical expenses of the MAO Assignor's enrollee arising out of the accident.

141.    Because Defendants were a primary payer—as established by the insurance policy or payment of one or more medical expenses or items—Defendants had a nondelegable duty with

respect to the First Party Policy Claims to reimburse the MAO Assignor for accident-related medical expenses paid by the MAO Assignor

142.    Defendants were required to timely reimburse the MAO Assignor for conditional payments of its Medicare beneficiaries' accident-related medical expenses.

143.    The MAO Assignor suffered damages as a direct result of Defendants' failure to comply with its statutory and regulatory duties under the MSP Act and the corresponding regulations within the Code of Federal Regulations.

144.    Defendants derived substantial monetary benefit by placing the burden of financing medical treatments on the MAO Assignor in violation of the MSP Act and to the detriment of the Medicare program.

145.    To the extent it was necessary, Defendants failed to administratively appeal the MAO Assignor's rights to reimbursement within the administrative remedies period. Defendants are, therefore, time-barred from challenging the propriety, reasonableness, and necessity of the amounts paid.

146.    Plaintiff seeks to recoup only those medical items or services provided to the MAO Assignor's Medicare beneficiary enrollees that were related to motor vehicle accidents covered by Defendants' insurance policies.

**COUNT III**
**Breach of Contract for Failure to Pay Benefits for the Contractual Claims**
**(Seeking the MAO Assignor's Unreimbursed Conditional Payments)**

147.    Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-122 as if fully set forth herein.

148.    Plaintiff alleges certain claims here by way of subrogation.

149.    At all material times, the MAO Assignor provided health insurance to Medicare

beneficiaries, including those set forth in the examples above.

150.    The MAO Assignor is subrogated to the right to recover from Defendants, in all instances in which Defendants are a primary plan, for Defendants' failure to make primary payment or reimbursement to the MAO Assignor for accident-related medical expenses.

151.    The MAO Assignor paid for its enrolled Medicare beneficiaries' accident-related medical expenses in amounts to be proven at trial, pursuant to its agreements with CMS.

152.    Defendants failed or refused to make primary payments of no-fault insurance benefits, or medical-payment benefits, as it was obligated to do.

153.    Defendants' failure to pay or make timely reimbursement for the MAO Assignor's enrolled Medicare beneficiaries' accident-related medical expenses has caused the MAO Assignor damages, as set forth here, in amounts to be proven at trial.

154.    To the extent necessary and not otherwise preempted by federal statute or regulation, Plaintiff complied with all applicable conditions precedent to the institution of this claim for reimbursement.

155.    For the First Party Claims, including those where Defendants issued policies in states where no-fault coverage is mandatory, as well as states where first-party medical coverage is optional, Defendants had a contractual obligation to pay benefits under a first-party policy that covered medical expenses.

## COUNT IV
## Fraudulent Concealment

156.    Plaintiff re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1-122 as if fully set forth herein.

157.    As described above, Plaintiff and its MAO Assignor's ability to identify and recover secondary payments is only as good as Defendants' compliance with its duty to report its

primary payer status, as required by federal law.

158.    Based on the claims information reported to CMS under Section 111, Plaintiff identified instances in which Defendants failed to properly reimburse on reported claims.

159.    In addition, on information and belief, Plaintiff alleges Defendants have not and cannot report all claims because it deliberately designed and operates a claim adjusting system that results in repeated, systematic failures to disclose its primary payer status for all first party policy claims and settlement claims as is its duty under the MSP Act and its implementing regulations.

160.    For all First Party Policy claims and Settlement claims, Defendants' duty is to disclose information about its primary payer status to CMS, for the benefit of Medicare and, by extension, MAOs such as Plaintiff's MAO Assignor.

161.    Defendants' primary payer status and the fact it acted as the first-party insurer or settled a liability claim under a third-party policy are pieces of information known and/or accessible only to Defendants, because they possessed exclusive and/or superior knowledge as to such facts. Moreover, Defendants knew these facts were not known to or reasonably discoverable by Plaintiff or its MAO Assignor.

162.    By virtue of its repeated, systematic failure to report its primary payer status when it acted as the first-party insurer or settled a liability claim under a third-party policy, Defendants knowingly and/or recklessly concealed this information breaching the duty prescribed to it under the MSP Act and its implementing regulations.

163.    Defendants' knowing and/or reckless concealment of its primary payer status by means of failure to report under Section 111 is a breach of duty separate and distinct from its failure to properly reimburse under the MSP Act and its implementing regulations.

164.     Plaintiff and its MAO assignor were unaware of the concealed material facts relating to Defendants' primary payer status for unreported First Party Policy and Settlement Claims and Plaintiff and its MAO Assignor would not have acted as they did if they had known Defendants were a primary payer for the unreported First Party Policy and Settlement Claims.

165.     Specifically, Plaintiff's MAO Assignor would not have made any secondary payments if Defendants had properly disclosed primary payer status before Plaintiff's MAO Assignor paid. Moreover, Plaintiff would have timely pursued reimbursement against Defendants, through issuance of a demand letter, had Defendants not concealed its primary payer status from Plaintiff and its MAO Assignor. Plaintiff through its MAO Assignor justifiably relied on the absence of a Section 111 report when making secondary payments on the unreported first party policy and settlement claims.

166.     Because the omission of the material fact that Defendants were a primary payer for the unreported First Party Policy and Settlement Claims, Plaintiff and its MAO Assignor sustained damages when the MAO Assignor paid for items and services that were the responsibility of Defendants. Had Plaintiff and its MAO Assignor known of the facts Defendants knowingly and/or recklessly concealed, Plaintiff's MAO Assignor would not have paid for items and services that were the responsibility of Defendants. In addition, even in instances where Plaintiff's MAO Assignor made such payments, Plaintiff would have timely pursued reimbursement against Defendants.

## COUNT V
### Declaratory Relief Pursuant to 28 U.S.C. § 2201
### (As Related to the MAO Assignor's Unreimbursed Payments)

167.     Plaintiff re-alleges and incorporates by reference each of the allegations contained in the preceding paragraphs 1-122 as if fully set forth here.

168.    Plaintiff alleges that as part of providing Medicare benefits under the Medicare Advantage program, Plaintiff's assignor paid for items and services which were also covered by no-fault, personal injury protection, or medical payments policies issued by Defendants.

169.    Defendants entered into settlements with beneficiaries relating to accidents but failed to reimburse Plaintiff's assignor for accident-related medical expenses paid by Plaintiff's assignor. As primary payers, Defendants had a nondelegable duty to reimburse conditional payments advanced by Medicare participants for accident-related medical services rendered to covered persons. Defendants are liable for reimbursement of these accident-related medical expenses, even if they subsequently paid out the maximum benefits under the policies.

170.    Defendants were required to timely reimburse Plaintiff's assignor for conditional payments made on behalf of beneficiaries' accident-related medical expenses.

171.    An actual, present, and justiciable controversy has arisen between Plaintiff and Defendants concerning their obligation to reimburse Plaintiff's assignor.

172.    Plaintiff seeks a declaratory Judgment from this Court establishing that Defendants have a historical, present, and continuing duty to reimburse Plaintiff's assignor for payments made on behalf of beneficiaries' accident-related medical expenses.  Plaintiff also seeks a declaration of what amounts are due and owing by Defendants to Plaintiff's assignor.

173.    A determination of what amounts are owed by Defendants to Plaintiff's assignor is complicated and difficult.

174.    A coordination-of-benefits process requires plans to share information between the primary payer and secondary plan and to act in good faith.

175.    The Code of Federal Regulations defines the coordination of benefits system as a

"coordination of benefits transaction."[15]

176.   The coordination of benefits transaction involves the exchange of thousands of claims data and data points between the parties to determine overlapping instances where Plaintiff's assignor made payment of medical items and services on behalf of a Medicare beneficiary who was entitled to the benefit of insurance coverage provided by the Defendants. This includes not only instances in which a Medicare beneficiary was directly insured by Defendants, but also instances in which a Medicare beneficiary was injured by Defendants' policyholder.

177.   The exchange of claims data would need to be done by extracting and producing certain data fields from Defendants' and Plaintiff's databases by using demographic identifiers, such as Social Security Number ("SSN"), Health Insurance Claim Number ("HICN"),[16] date of birth, sex, and address. Beneficiary matching pinpoints the number of relevant insureds and simplifies the process of identifying reimbursable claims, which is done by matching the date of loss (for Defendants), with dates of payment (for Plaintiff), and then discovering what Defendants reimbursed (if anything), and to whom.

178.   The data Plaintiff requests from Defendants to perform an accounting is information Plaintiff is already entitled to without litigation. 42 C.F.R. § 411.25(a); 59 Fed. Reg. 4285.

179.   Given the size of the claims and data points being exchanged between the parties, the coordination of benefits transaction is complex.

180.   Thus, Plaintiff lacks an adequate legal remedy to obtain the requested information.

---

[15] The "coordination of benefits transaction" is the transmission from any entity to a health plan for the purpose of determining the relative payment responsibilities of the health plan, of either of the following for health care: (a) claims and (b) payment information. 45 CFR § 162.1801.
[16] Also known as a Medicare Beneficiary Identifier ("MBI").

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all of the triable issues within this pleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendants granting the following relief:

i.      A judgment for any secondary payments made by Plaintiff's MAO Assignor which Defendants should have paid based on its primary payer status for First Party Policy Claims and Settlement Claims;

ii.     A judgment awarding double damages for those amounts to which Plaintiff is entitled to reimbursement as allowed under 42 U.S.C. § 1395y(b)(3)(A);

iii.    In the alternative, a declaratory judgment for the relief requested in Count V;

iv.     A judgment awarding Plaintiff pre-judgment and post-judgment interest;

v.      Attorneys' fees as may be allowed under any applicable law;

vi.     Tolling any applicable statute of limitations for First Party Policy Claims and Settlement Claims Defendants were under a duty to report pursuant to Section 111 but concealed by means of its failure to properly report; and

vii.    A judgment awarding Plaintiff such other and further relief as the Court deems just and proper under the circumstances.

Dated: October 13, 2023

Respectfully Submitted:

*/s/ Sanford P. Dumain*
CT Bar No.: 08138
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**

100 Garden City Plaza
Garden City, NY 11530
Tel: (212) 594-5300
Fax: (212) 818-9150
Email: sdumain@milberg.com

*/s/ Justin G. Day*
Justin G. Day, Esq.*
TN Bar No.: 33267
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Primary email:  jday@milberg.com
Secondary Email: ralves@milberg.com

*/s/ Austin M. Krtausch*
Austin M. Krtausch, Esq.*
FL Bar No.: 0255221
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
201 Sevilla Avenue, Suite 200
Coral Gables, FL 33314
Primary email:  akrtausch@milberg.com
Secondary Email: ralves@milberg.com

***Attorneys for Plaintiff**
  (* **Pro Hac Vice Motions Pending***)